## Mammoth Blue Gem Coal Company v. Elswick.

(Decided March 6, 1923.)

## Appeal from Whitley Circuit Court.

1. Mines and Minerals—In Action for Breach of Mining Contract, Instructions Held as Favorable to Defendant as it Could Ask.— In a miner's action for breach of contract by which he was to be paid a specified price for mining all the coal in a certain entry in defendant's mine, in which defendant counterclaimed on ground that plaintiff abandoned the contract, instructions as to the rights of the parties and the measure of damages held as favorable to defendant as it could ask.

2. Mines and Minerals—Evidence as to Profits Which Would Have Been Made on Broken Contract Held to Sustain Verdict.—In miner's action for breach of a contract for the mining of all the coal in a certain entry of defendant's mine at a specified price, evidence as to the profits he would have made if permitted to complete the contract held to sustain a verdict for the amount awarded.

TYE & SILER for appellant.

STEPHENS & STEELEY for appellee.

OPINION OF THE COURT BY JUDGE MCCANDLESS—Affirming.

In July, 1918, J. W. Elswick and the Mammoth Blue Gem Coal Company entered into a written contract in which it was agreed that Elswick was to mine all the territory of coal known as the third right entry in the number two mine and deliver same at the room neck, and the company was to haul the coal, furnish him trackage and keep the water, in excess of three barrels per day, bailed out of the working places in the entry and pay him $2.00 per ton for coal at the room neck.

At that time miners were receiving $1.60 per ton for their work, this to include powder, and it was agreed that if the scale of wages on that field should be raised that the contract price to Elswick should be raised the same amount.

Elswick began his work in that month and continued to October 31, 1919, at which time the mine was closed down. It was claimed by the company that this was caused by a strike of the miners, that Elswick was a union man and went out with the other miners; that it had information on November 12 that the strike was declared off and that it tried at that time to get him to go back to work and that he refused to do so; that this was an abandonment of the contract and that it made other arrangements for further development of the mine.

On the other hand Elswick claims that he and his hands could only work when the regular force of the mine was working, that otherwise he could not get his coal hauled and water bailed, that during the month of April the company did but three days' work and that he acquiesced in that then, and on different occasions, only working when it did. He claims that on October 31, 1919, the company shut the mine down and brought out his tools without consulting him; that the mine continued closed during the month of November; that on the 24th of the month he went to see the president of the company about going back to work and was informed by him that he could only go back as a laborer as the company was going to work the mine.

Subsequently thereto he brought suit in the Whitley circuit court for breach of contract, praying a recovery of $4,200.00 in damages; the company denied a breach on its part, pleaded a corresponding breach by him, and

alleged that it would have made a profit of $1.60 a ton on the coal he failed to produce under the contract; it made its answer a counterclaim and asked $12,800.00 damages against him. A jury trial resulted in a verdict of $1,-400.00 for Elswick and the company has appealed.

No work was done under the contract subsequent to October 31, 1919, and there were but two issues to be considered by the jury, and they were as to which party breached the contract, and the amount of damages, if any, sustained by the party aggrieved.

The first instruction set out the contract and authorized a recovery for appellee if it was abandoned and repudiated by appellant, at a time when appellee was ready, able and willing to perform it. While unnecessarily long we cannot see how the jury was confused by it, and as the measure of damage was correctly stated the appellant was not prejudiced thereby.

Instruction No. 2 authorized the jury if they believed from the evidence that Elswick was a member of the miners' union and as such obeyed the order to strike on October 31, 1919, and that while the strike was on the company through its president requested Elswick to comply with his part of the contract and that he refused to do so, that they should find for the defendant on its counterclaim, further setting out the measure of damage.

Instruction A-1, given on motion of appellant, further restricted the measure of damage if a verdict was given appellee. It reads:

"If you find for the plaintiff, then in estimating his reasonable profits you should deduct from $2.00 per ton not on the actual cost of mining the coal and the expense of the dead work such as shooting slate, laying track, etc., but you should also make such further deduction as you may believe from the evidence is reasonable for the less time engaged by him, and also for his release from the care, trouble, risk and responsibility attending a full execution of the contract."

It will be observed that these instructions were as favorable as appellant could ask, if not more so; and while the evidence was conflicting it was sufficient to uphold a verdict for appellee. The chief question is as to whether the verdict is excessive.

Under the contract the appellant furnished the brattice cloth, track timbers and all necessary material, and hauled the water in connection with the coal; and also paid so much per yard for driving entry into rock or

slate; but appellee was to do the dead work, that is, laying the track and keeping up the timbers, shooting the slate and running it to the entry, keeping up the brattices and driving the airways or widening the rooms. As stated, the miners were paid $1.60 per ton and the cost of these items must be added to this sum, and the total of this deducted from $2.00 would represent his net profit. Appellee claims that he kept an account of his operating expenses during the year 1919 and gives the total cost of various months at an average of 10½ cents per ton during those months or that he made a net profit of 29½ cents per ton.

He further claims that most of the entries had been driven and track laid and that the remaining work would have been cheaper, especially in "robbing" the mine, this being a term applied to removing the pillars or stumps which are left to support the roof so long as the work is being extended, but when driven up these are removed and require but little, if any, of the dead work mentioned, and that he could have made 35 cents net. It is admitted by both parties that there was as much as 8,000 tons of coal remaining in the mine, and at the rate of profit he claims to have made on the previous work he would have made $2,280.00 if the contract had been completed, or more if the "robbing" work had yielded a higher rate of profit. It is evident that he includes his own labor in this.

On the other hand the appellee claims that the actual cost of the dead work and extra mining in robbing was more than the 40 cents margin allowed him in the contract. It is shown that it paid his miners at the rate of $1.60 per ton. Its books show that appellant ran an account with it up to May, 1919, and his earnings just about paid his monthly account though the amount thereof is not shown. After that month only his mine expenses were charged to him and the books show that there was credited to him from his profit from then on over and above his expenses, in May $115.83, June $146.36, July $144.43, August $121.15, September $167.14, October $187.97. But it appears that the company divided the earnings between him and his two sons, and if his monthly profits were three times as large as set out above, it would seem that his contract was a profitable one.

The appellant's president itemizes the dead work and figures the total cost thereof at from 26 to 32 cents a

ton; the mine foreman makes it just a little higher, though they do not agree as to the items. The president included brattices and driving airways, while the mine foreman included both, and also the item of widening rooms, but on cross-examination states that in this work they widened the rooms and did not drive separate airways. However that may be, taking the president's figures it will be seen that in the cost of previous work they indicate a net profit to appellee of from eight to fourteen cents a ton. The appellee claims a profit of 29½ cents. The jury gave a verdict for $1,400.00, which is equal to 17½ cents a ton, or very little more than the maximum figures of the president. It is true that the appellant's witnesses state that to "rob" a mine would require experienced miners at a higher price, but on the other hand appellee's witnesses, while they admit that it would require experienced miners, deny that the mining would cost more, and assert that the dead work would be much cheaper. On the whole case we cannot say that the verdict is excessive.

Judgment affirmed.